# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| DAJUAN EMERSON, | ) | CASE NO. 1:14-cv-809 |
| | ) | |
| Petitioner, | ) | JUDGE JAMES GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| BENNIE KELLY, Warden | ) | |
| | ) | |
| Respondent. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

Petitioner, DaJuan Emerson ("Emerson"), challenges the constitutionality of his conviction in the case of *State v. Emerson*, Cuyahoga County Court of Common Pleas Case No. CR09521612-A.  Emerson, represented by counsel, filed his Petition for a Writ of Habeas Corpus (ECF No. 1) pursuant to 28 U.S.C. § 2254 on April 15, 2014.  On June 20, 2014, Warden Bennie Kelly ("Respondent") filed his Answer/Return of Writ.  (ECF No. 9.)  After receiving numerous extensions of time, Emerson filed a Traverse on November 17, 2014.  (ECF No. 17.) For reasons set forth in detail below, it is recommended that Emerson's petition be DENIED.

### I.  Summary of Facts

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, factual determinations made by state courts are presumed correct.  28 U.S.C. § 2254(e)(1); *see also Franklin v. Bradshaw*, 695 F.3d 439, 447 (6th Cir. 2012); *Montgomery v.*

*Bobby*, 654 F.3d 668, 701 (6th Cir. 2011).  The state appellate court summarized the facts

underlying Emerson's conviction as follows:

> [**P2]  On July 4, 2007, the Cleveland police responded to the home of Marnie
> Macon on Elton Road in Cleveland, Ohio. Officers found Macon stabbed to death
> and naked from the waist down. The police began the task of collecting evidence,
> including a knife, a beer can, and samples from a spot of blood found on a door
> knob inside the home. The police also noted a bottle of household cleaner laying
> on or near the victim and evidence that the knife as well as the victim's body had
> been cleaned in an apparent attempt to destroy evidence.

> [**P3]  The case remained unsolved until 2009 when a positive DNA profile
> match from the bloody doorknob to one contained in the state DNA database led
> the Cleveland police to bring appellant in for questioning. When questioned about
> his familiarity with the Elton Road home, he denied ever having been there.
> However, once he learned of the DNA evidence, he said that he had been there on
> July 3 or 4, 2007, after he had met a woman at a bar and paid her money for sex,
> but he left her unharmed. Officers prepared a written statement for appellant to
> sign detailing this discussion, but appellant refused to sign.

> [**P4]  Appellant was indicted by a Cuyahoga County grand jury on charges of
> aggravated murder in violation of R.C. 2903.01, aggravated burglary in violation
> of R.C. 2911.11, and tampering with evidence in violation of R.C. 2921.12. He
> filed a motion to suppress his statements to the police and a supplementary motion
> seeking to suppress his DNA identification. On October 16, 2009, the trial court
> held a hearing on these motions. The evidence presented at the hearing
> demonstrated that, as a result of a 2005 rape investigation, a sample of appellant's
> DNA was lawfully obtained and entered into the state DNA database as a known
> suspect.  Appellant was tried and acquitted of those 2005 charges, but his DNA
> profile remained in the state database.

> [**P5]  Then, in 2009, a DNA profile was obtained from the blood left on the
> doorknob inside Macon's home.  This profile of an unknown individual was
> entered into the state database and matched appellant's profile obtained from the
> 2005 investigation.  Appellant argues that the statutory scheme establishing the
> state database did not allow for the retention of records of acquitted individuals,
> and therefore, the identification and everything flowing therefrom must be
> suppressed.  The trial court determined that the state had the authority to maintain
> the records and denied appellant's motion to suppress the DNA identification and
> his statements to the police.

> [**P6]  A jury trial commenced on October 19, 2009 and resulted in appellant

being found guilty of aggravated murder and tampering with evidence. The trial court dismissed the charge of aggravated burglary pursuant to appellant's Crim.R. 29 motion. Appellant was sentenced to an aggregate prison term of 25 years-to-life on November 18, 2009.

*State v. Emerson*, 949 N.E.2d 538, 192 Ohio App. 3d 446, 2011-Ohio-593 (Ohio Ct. App. 2011) (footnotes omitted).

## II.  Procedural History

### A.  Conviction

On March 9, 2009, a Cuyahoga County Grand Jury charged Emerson with one count of aggravated murder in violation of Ohio Revised Code ("O.R.C.") § 2903.01(A), one count of aggravated burglary in violation of O.R.C. § 2911.11(A)(1), and one count of tampering with evidence in violation of O.R.C. § 2921.12(A)(1).  (ECF No. 9-1, Exh. 1.)  Emerson pled not guilty. (ECF No. 9-2, Exh. 2.)

Prior to trial, Emerson filed a motion to suppress statements he made to the police (ECF No. 9-3, Exh. 3), a second motion to suppress seeking to exclude his DNA identification (ECF No. 9, Exhs. 4 & 5), and a motion *in limine* to prevent the introduction of any DNA evidence at trial.  (ECF No. 9-6, Exh. 6.)  The State responded to the motions to suppress (ECF No. 9-10, Exh. 10), and Emerson replied.  (ECF No. 9-11, Exh. 11.)  After holding a hearing, the trial court denied Emerson's motions.  (ECF No. 9-12, Exh. 12.)

On October 22, 2009, a jury found Emerson guilty of aggravated murder and tampering with evidence.[1]  (ECF No. 9-15, Exh. 15.)  On November 8, 2011, the trial court sentenced Emerson to a term of life in prison with parole eligibility after twenty-five years on Count I, and

---

[1]  Emerson's Ohio Criminal Rule 29 motion for acquittal was granted as to the charge of aggravated burglary.  (ECF No. 9-15, Exh. 15.)

-3-

one year in prison on Count III.  (ECF No. 9-16, Exh. 16.)  The sentences were to be served concurrently.  *Id*.

**B.    Direct Appeal**

On December 21, 2009, Emerson, through new counsel R. Brian Moriarty, filed a Notice of Appeal with the Court of Appeals for the Eighth Appellate District ("state appellate court") raising the following assignments of error:

1.    The trial court erred and/or abused its discretion when it denied defendant's motion to suppress.

2.    The guilty verdict is based upon insufficient evidence.

3.    The guilty verdicts are against the manifest weight of the evidence.

4.    The trial court abused its discretion in failing to give jury instructions for a lesser included offense.

5.    Defendant was denied the effective assistance of counsel.

(ECF No. 9, Exhs. 17 & 18.)

On February 10, 2011, Emerson's conviction was affirmed.  (ECF No. 9-20, Exh. 20.)

On March 25, 2011, Emerson, through counsel, filed a Notice of Appeal with the Supreme Court of Ohio raising the following propositions of law:

1.    When DNA is obtained by the state in an investigation which results in the acquittal of the individual, that individual maintains standing to challenge the improper retention and subsequent use of his/her DNA in a subsequent proceeding.

2.    The State of Ohio does not have the authority to retain and/or subsequently use the DNA taken from an individual during a criminal investigation when that individual is acquitted of that crime.

3.    A search warrant affidavit seeking a DNA buccal swab is insufficient to

-4-

establish probable cause if it is based primarily upon the individual's classification as a "convicted felon" and/or a "known suspect" as set forth in R.C. 2907.01, when the individual is neither.

4.    After an individual refuses to sign and [sic] written statement and/or acknowledge that his prior statements were truthful, the statements and all evidence derived from said statements must be suppressed.

5.    Mere presence at a crime scene, without more, is insufficient evidence to establish prior calculation and design beyond a reasonable doubt.

6.    A jury verdict is against the manifest weight of the evidence when prior calculation and design and tampering with evidence are based solely upon an individual's presence at the crime scene.

7.    A trial court abuses its discretion in failing to provide a lesser included offense instruction when prior calculation and design is based solely upon circumstantial evidence and inferences.

8.    Ineffective assistance of counsel is established when defense counsel fails to request a *Franks* Hearing concerning the sufficiency of a search warrant affidavit based solely upon improper statutory classifications and when it [sic] fails to request a lesser included offense charge when prior calculation and design is based solely upon the Defendant's presence.

(ECF No. 9, Exhs. 21 & 22.)

On June 22, 2011, the appeal was accepted with respect to the first two propositions of law only.  (ECF No. 9-23, Exh. 23.)

On November 1, 2012, the Supreme Court of Ohio affirmed the judgment of the state appellate court, finding that "[a] person has no reasonable expectation of privacy in his or her DNA profile extracted from a lawfully obtained DNA sample, and a defendant lacks standing to object to its use by the state in a subsequent criminal investigation."  (ECF No. 9-28, Exh. 28.)

On January 30, 2013, Emerson, through counsel, filed a petition for a writ of certiorari with the United States Supreme Court presenting the following question: "Under the Fourth

-5-

Amendment, does a person have a reasonable expectation of privacy in his or her lawfully

obtained DNA profile?"  (ECF No. 9-29, Exh. 29.)

On April 15, 2013, the United States Supreme Court denied the petition.  (ECF No. 9-30,

Exh. 30.)

**C.  Federal Habeas Petition**

On April 15, 2014, Emerson filed a Petition for Writ of Habeas Corpus asserting the

following grounds for relief:

> GROUND ONE: The trial court violated petitioner's Fourth Amendment [rights], made applicable to the states by the Fourteenth Amendment, when it denied petitioner's motion to suppress.

> GROUND TWO: The Ohio appellate courts violated [petitioner's] rights [under] the Fourth Amendment, made applicable to the states by the Fourteenth Amendment, when it determined petitioner did not have standing to challenge the collection, retention, and use of his DNA profile once it is lawfully obtained and/or the 2009 DNA sample.

> GROUND THREE: The Ohio appellate courts violated [petitioner's] due process rights under the Fifth Amendment, made applicable to the states by the Fourteenth Amendment, when it determined petitioner did not have standing to challenge the collection, retention, and use of his DNA profile once it is lawfully obtained and/or his 2009 DNA sample.

> GROUND FOUR: Trial counsel did not provide effective assistance of counsel pursuant to the Sixth Amendment, made applicable to the states under the Fourteenth Amendment.

(ECF No. 1.)

### III.  Exhaustion and Procedural Default

**A.  Exhaustion Standard**

Petitioners must exhaust their state remedies prior to raising claims in federal habeas

corpus proceedings.  *See* 28 U.S.C. § 2254(b),( c).  This requirement is satisfied "when the

highest court in the state in which the petitioner was convicted has been given a full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990).  However, if relief is no longer available in state court, exhaustion can be rendered moot:  "If no remedy exists, and the substance of a claim has not been presented to the state courts, no exhaustion problem exists; rather, it is a problem of determining whether cause and prejudice exist to excuse the failure to present the claim in the state courts." *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994); *see Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001).

**B.   Procedural Default Standard**

Federal courts will not consider the merits of procedurally defaulted claims, unless the petitioner demonstrates cause for the default and prejudice resulting therefrom, or where failure to review the claim would result in a fundamental miscarriage of justice.  *See Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir.2006) (*citing Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)). A claim may become procedurally defaulted in two ways. *Id*.  First, a petitioner may procedurally default a claim by failing to comply with state procedural rules in presenting his claim to the appropriate state court.  *Id.*; *see also Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). If, due to petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.[2] *Id.*

---

[2]  In *Maupin*, the Sixth Circuit established a four-step analysis to determine whether a claim is procedurally defaulted.  785 F.2d at 135.  Under this test, the Court decides (1) whether the petitioner failed to comply with an applicable state procedural rule, (2) whether the state courts actually enforced the state procedural sanction, (3) whether the state procedural bar is an "independent and adequate" state ground on which the state can foreclose federal review, and (4) whether the petitioner has demonstrated "cause" and "prejudice."  *Id*. at 138-39; *Barkley v. Konteh*, 240 F.Supp.2d 708 (N.D. Ohio 2002).  "In

Second, a petitioner may also procedurally default a claim by failing to raise and pursue that claim through the state's "ordinary appellate review procedures."  *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).  If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, it is procedurally defaulted. *Engle v. Isaac*, 456 U.S. 107, 125 n. 28 (1982); *see also Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991); *Lovins*, 712 F.3d at 295 ("a claim is procedurally defaulted where the petitioner failed to exhaust state court remedies, and the remedies are no longer available at the time the federal petition is filed because of a state procedural rule.")  This second type of procedural default is often confused with exhaustion. Exhaustion and procedural default, however, are distinct concepts.  AEDPA's exhaustion requirement only "refers to remedies still available at the time of the federal petition." *Engle*, 456 U.S. at 125 n. 28.  Where state court remedies are no longer available to a petitioner because he failed to use them within the required time period, procedural default and not exhaustion bars federal court review.  *Id.*  In Ohio, a petitioner is not entitled to raise claims in post-conviction proceedings where those claims could have been raised on direct appeal.  *Id.* Thus, if an Ohio petitioner failed to raise a claim on direct appeal, which could have been raised, the claim is procedurally defaulted.  *Id.*

A claim is adequately raised on direct appeal if it was "fairly presented" to the state court. To fairly present a claim to a state court a petitioner must assert both the legal and factual basis

---

determining whether a state court actually enforced a procedural rule, we apply the 'plain statement' rule of *Michigan v. Long*, 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983)."  *Lovins v. Parker*, 712 F.3d 283, 296 (6th Cir. 2013) ("a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar.") (citations omitted).

for his claim. *See McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). Accordingly, a "petitioner must present his claim to the state courts as a federal constitutional issue--not merely as an issue arising under state law." *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984). A petitioner can take four actions in his brief which are significant to the determination as to whether a claim has been fairly presented as a federal constitutional claim: "(1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law." *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003).

A petitioner's procedural default, however, may be excused upon a showing of "cause" for the procedural default and "actual prejudice" from the alleged error. *See Maupin*, 785 F.2d at 138-39. "Demonstrating cause requires showing that an 'objective factor external to the defense impeded counsel's efforts to comply' with the state procedural rule." *Franklin v. Anderson*, 434 F.3d 412, 417 (6th Cir. 2006) (*quoting Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Meanwhile, "[d]emonstrating prejudice requires showing that the trial was infected with constitutional error." *Id.* Where there is strong evidence of a petitioner's guilt and the evidence supporting petitioner's claim is weak, the actual prejudice requirement is not satisfied. *See United States v. Frady*, 456 U.S. 152, 172 (1982); *Perkins v. LeCureux*, 58 F.3d 214, 219-20 (6th Cir. 1995); *Rust v. Zent*, 17 F.3d 155, 161-62 (6th Cir. 1994). Prejudice does not occur unless petitioner demonstrates "a reasonable probability" that the outcome of the trial would have been different. *See Mason v. Mitchell*, 320 F.3d 604, 629 (6th Cir. 2003) (*citing Strickler v. Greene*,

527 U.S. 263, 289 (1999)).

Finally, a petitioner's procedural default may also be excused where a petitioner is actually innocent in order to prevent a "manifest injustice." *See Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991). Conclusory statements are not enough – a petitioner must "support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995)*; See Jones v. Bradshaw*, 489 F.Supp.2d 786, 807 (N.D.Ohio 2007).

## IV.  Review on the Merits

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997).  The relevant provisions of AEDPA state:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1996).

Clearly established federal law is to be determined by the holdings of the United States Supreme Court.  *See Parker v. Matthews,* 132 S. Ct. 2148, 2012 WL 2076341, *6 (U.S. Jun. 11, 2012); *Renico v Lett,* 559 U.S. –, 130 S.Ct. 1855, 1865-1866 (2010); *Williams v. Taylor*, 529

-10-

U.S. 362, 412 (2000); *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6ᵗʰ Cir. 2005).  However, an explicit statement by the Supreme Court is not mandatory; rather, "the legal principles and standards flowing from [Supreme Court] precedent" also qualify as "clearly established law." *Ruimveld*, 404 F.3d at 1010 (*quoting Taylor v. Withrow*, 288 F.3d 846, 852 (6ᵗʰ Cir. 2002))  The Supreme Court has indicated, however, that circuit precedent does not constitute "clearly established Federal law, as determined by the Supreme Court." *Parker*, 2012 WL 2076341, *6; *Howes v. Walker,* 132 S.Ct. 2741, 2012 WL 508160 (2012).

A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 413.  By contrast, a state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*.  However, a federal district court may not find a state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 411.  Rather, a federal district court must determine whether the state court's decision constituted an objectively unreasonable application of federal law.  *Id*. at 410-12.  "This standard generally requires that federal courts defer to state-court decisions." *Strickland v. Pitcher*, 162 Fed. Appx. 511, 516 (6ᵗʰ Cir. 2006) (*citing Herbert v. Billy*, 160 F.3d 1131, 1135 (6ᵗʰ Cir. 1998)).

In *Harrington v. Richter*, ⸺ U.S. ⸺, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011), the

-11-

Supreme Court held that as long as "fairminded jurists could disagree on the correctness of the state court's decision," relief is precluded under the AEDPA.  *Id.* at 786 (internal quotation marks omitted).  The Court admonished that a reviewing court may not "treat[ ] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 785.  The Court noted that Section 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Id.* (internal quotation marks omitted).  Therefore, a petitioner "must show that the state court's ruling ... was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786–87.  This is a very high standard, which the Supreme Court readily acknowledged. *See id.* at 786 ("If this standard is difficult to meet, that is because it is meant to be.")

**A. Grounds One, Two and Three: Fourth Amendment Claim and Right to Appeal**

In his first ground for relief, Emerson asserts that his Fourth Amendment right prohibiting unreasonable searches and seizures was violated when the State of Ohio allowed his DNA profile, lawfully developed from a previous investigation and prosecution for which he was acquitted, to be used against him in the instant case.[3]  (ECF Nos. 1, 17.)  Emerson also takes issue with the propriety of a warrant which incorrectly referred to him as a convicted felon, arguing he had no prior criminal record. *Id.*  In his second ground for relief, Emerson again alleges a Fourth Amendment violation arguing that the State of Ohio incorrectly determined that

---

[3]  Emerson asserts that the retention of his DNA profile was improper under Ohio law.

-12-

he did not have a privacy interest in the DNA profile created from the DNA sample obtained during his first prosecution.  (ECF Nos. 1, 17.)  Emerson's second ground for relief is merely an extension of his first, as both argue that the State erred when it allowed his DNA profile to be used in the criminal investigation leading to the underlying criminal prosecution.  In his third ground for relief, Emerson asserts that his Fifth Amendment rights were violated when the state courts found he did not have standing to challenge the State's use of his DNA profile created during a prior criminal prosecution.  *Id*.  Though Emerson styles his third ground for relief as a Fifth Amendment claim, it is based, in its entirety, on his Fourth Amendment argument.  (ECF No. 1.)  Therefore, the Court views Emerson's arguments in grounds one, two and three as interrelated and they will be addressed accordingly.

Respondent argues that both grounds one and two are not cognizable upon federal habeas review, as Emerson was afforded an opportunity to fully and fairly litigate his Fourth Amendment claims under *Stone v. Powell*, 428 U.S. 465, 494, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).  (ECF No. 9 at 9-15.)  As to ground three, Respondent disputes that the state courts found Emerson had no standing to challenge the use of the DNA profile, asserting that he received more appellate review than is constitutionally required.  *Id*. at 13-16.

Generally, a writ of habeas corpus cannot be granted on the ground that a petitioner's Fourth Amendment rights were violated if the petitioner had an opportunity to present the claim in state court.  *See Stone*, 428 U.S. at 494 (1976); *Wallace v. Kato*, 549 U.S. 384, 395 n. 5, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007); *accord Ewing v. Ludwick*, 134 Fed. Appx. 907, 911 (6th Cir. 2005).  The United States Supreme Court has held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be

-13-

granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone*, 428 U.S. at 494.  The Sixth Circuit has found that the determination as to whether a petitioner has had  "an opportunity for full and fair litigation of a Fourth Amendment claim" requires a federal district court to make two separate inquiries.  *Riley v. Gray*, 674 F.2d 522, 526 (6ᵗʰ Cir. 1982) (citations omitted).  First, the district court should ascertain "whether the state procedural mechanism, in the abstract, presents the opportunity to raise a fourth amendment claim."  *Id*.  Second, the district court must ascertain "whether presentation of the claim was in fact frustrated because of a failure of that mechanism."  *Id.*  Because the Sixth Circuit already has determined that "[t]he mechanism provided by the State of Ohio for the resolution of fourth amendment claims is ... clearly adequate," this Court's role is confined to the second inquiry—namely whether presentation of the claim was in fact frustrated because of a failure of that mechanism.  *Id*.; *accord Bridges v. Bradshaw*, 2006 U.S. Dist. LEXIS 96749 (N.D. Ohio 2006).

Emerson's defense counsel filed a motion to suppress, a supplemental motion to suppress, as well as a motion *in limine*, all seeking to prevent the introduction of the DNA evidence at trial. (ECF No. 9, Exhs. 4, 5 & 6.)  It is undisputed that a hearing was held on October 16, 2009 to address these motions where testimony and evidence was presented, but the motions were denied.  (ECF No. 9-12, Exh. 12.)  On appeal, the state appellate court addressed Emerson's argument as follows:

> The Retention of DNA Records
>
> [**P8]  Appellant raises an issue not previously addressed by appellate courts in Ohio. Arguing that R.C. 2901.07 and 109.573 do not authorize the continued retention of the DNA profile of one acquitted of a crime, appellant asserts his

-14-

identification should have been suppressed.

[**P9]  "In a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate witness credibility. A reviewing court is bound to accept those findings of fact if supported by competent, credible evidence. However, without deference to the trial court's conclusion, it must be determined independently whether, as a matter of law, the facts meet the appropriate legal standard." (Internal citations omitted.) *State v. Curry* (1994), 95 Ohio App.3d 93, 96, 641N.E.2d 1172.

[**P10]  The Combined DNA Index System ("CODIS") "is a computerized program designed to house DNA profiles from convicted offenders, forensic samples, suspects, missing persons, unidentified remains and relatives of missing persons in various searchable databases." Baringer, CODIS Methods Manual (Rev. 5 2009). These profiles are generated using DNA samples that are processed to create a DNA profile unique to the individual.  CODIS has three levels — local, state, and national, with the Cuyahoga County Coroner's Office controlling the local database, the Ohio Bureau of Criminal Identification and Investigation ("BCI") controlling the state database, and the Federal Bureau of Investigation maintaining the federal database. *Id*. Former R.C. 2901.07, as it existed prior to its amendment in 2010, authorized the creation and maintenance of a DNA profile database populated with DNA profiles from convicted persons. Current R.C. 2901.07 adds authority to collect and store the profiles of those arrested on felony charges as well as those convicted of a felony. R.C. 2901.07(B)(1). R.C. 109.573 is a similar statute dealing with records from "forensic casework or crime scenes, specimens from anonymous and unidentified sources[,]" and missing persons and their relatives. All 50 states have such legislation. *State v. Gaines*, Cuyahoga App. No. 91179, 2009 Ohio 622, ¶58.

[**P11]  A DNA profile is a record separate and distinct from the DNA sample from which it is created. Therefore, we must address the state's contention that appellant lacks standing to challenge the search. More specifically, the state alleges that appellant has no ownership interest in the DNA profile created from his validly collected DNA sample.  "Under Fourth Amendment law, the standing and search and seizure inquiries 'merge into one: whether governmental officials violated any legitimate expectation of privacy held by petitioner.' *Rawlings v. Kentucky*, 448 U.S. 98, 106, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). Fourth Amendment rights are personal and may not be vicariously asserted. *Rakas v. Illinois*, 439 U.S. 128, 133-34, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)." *Smith v. State* (Ind. 2001), 744 N.E.2d 437, 439.

[**P12]  In Smith, a defendant challenged a DNA search and match involving Indiana's DNA database using a DNA profile that remained in the state database

-15-

after acquittal of the crimes for which the sample was taken. The Indiana Supreme Court ruled that the trial court properly denied a motion to suppress based on the Fourth Amendment because the sample was lawfully obtained during the first investigation. That court held, "once DNA is used to create a profile, the profile becomes the property of the Crime Lab. Thus, [a defendant] had no possessory or ownership interest in it. Nor does society recognize an expectation of privacy in records made for public purposes from legitimately obtained samples." *Id*. at 439. *See, also, State v. Barkley* (2001), 144 N.C.App. 514, 519, 551 S.E.2d 131 ("It is also clear that once a person's blood sample has been obtained lawfully, he can no longer assert either privacy claims or unreasonable search and seizure arguments with respect to the use of that sample. Privacy concerns are no longer relevant once the sample has already lawfully been removed from the body, and the scientific analysis of a sample does not involve any further search and seizure of a defendant's person.").

[**P13]  Analogizing the taking of a DNA sample with the taking of fingerprints, this court has previously noted that a convicted individual's privacy interest in these identifying records is particularly weak. *Gaines*, *supra*, at P58, citing *In re Nicholson* (1999), 132 Ohio App.3d 303, 724 N.E.2d 1217, and *Davis v. Mississippi* (1969), 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676.

[**P14]  The state also sees similarity in a Georgia appellate case, *Fortune v. State* (2009), 300 Ga.App. 550, 685 S.E.2d 466, and argues that its analysis and holding should apply here. In Fortune, a DNA sample was collected from seminal fluid found on carpeting at a crime scene, and a DNA profile was prepared and entered into Georgia's state database. This DNA profile of an unknown individual was entered into the federal CODIS database and labeled with a Georgia criminal case number related to the crime. This criminal case number and related information showed that Fortune was the main suspect and was tried and acquitted in that case. Later, a DNA profile obtained from lip balm at a crime scene involving a separate criminal investigation was matched to the unknown DNA profile generated from the sample collected from the carpet stain. *Id*. at 554. However, because this profile contained a criminal case number that identified Fortune, he argued that it was not of an "unknown" individual and should have been purged from the database after his acquittal. The Georgia appellate court noted that the defendant could have requested expungement of the criminal records from the first case pursuant to Georgia's expungement statute. The expungement statute is similar to Ohio's statutory scheme.

[**P15]  Like Georgia's DNA collection statutes, Ohio's scheme does not specify what should happen to validly obtained samples maintained in the database after acquittal. Citing *Smith*, *supra*, the *Fortune* court declined to adopt an exclusionary rule in the case, noting that "'[e]xclusion of extremely valuable evidence in crimes

-16-

that often leave little other trace is a major social cost,' and 'the potential for abuse in the future is not sufficiently clear to warrant adopting a rule excluding evidence from the database on the ground that it was obtained or retained beyond the authorized classifications.'" *Id*. at 556, quoting *Smith*, at 440.

[**P16]  Citing to Section 17.60 of the CODIS Manual, appellant claims the record should have been removed. However, this section dealing with expungement does not require removal of records after acquittal. Had appellant desired records of this earlier unsuccessful prosecution to be expunged, he could have requested expungement, and then any DNA profile would have been removed pursuant to this section. Although not clear, Ohio appears to place the onus of removal from the state database on those acquitted of a crime. At the very least, the exclusionary rule should not be applied to this case where the DNA profile was validly obtained from the first case, appellant had no possessory or privacy interest in the profile, and the federal CODIS regulations offer a significant deterrent in the form of exclusion from the federal database. *See Smith* at 440.

[**P17]  Here, because appellant has no possessory interest in his DNA profile generated from a lawfully obtained DNA sample, he lacks standing to challenge the later CODIS records search as a violation of his Fourth Amendment rights. This view is also shared by Maryland. *See Williamson v. State* (2010), 413 Md. 521, 993 A.2d 626.

[**P18]  Appellant also argues that the search warrant issued to obtain a sample of appellant's DNA used to confirm the match already obtained from the  [*458] CODIS system was defective and should also result in the exclusion of the evidence.

[**P19]  Detective Joseph Chojnowski testified at the suppression hearing that he received a report of a DNA profile match from the Cuyahoga County Coroner's office.  He then applied for and received a search warrant to obtain a DNA sample from appellant via buccal swab.  Appellant argued this warrant was defective because the attached affidavit described CODIS as a "database that stores sample DNA from convicted felons in the State of Ohio."  In reality, CODIS stores DNA profiles from several classes of individuals, including convicted felons.

[**P20]  "An affidavit supporting a search warrant enjoys a presumption of validity. To successfully attack the veracity of a facially sufficient affidavit, a defendant must show by a preponderance of the evidence that the affiant made a false statement either 'intentionally or with a reckless disregard for the truth.' 'Reckless disregard' means that the affiant had serious doubts about an allegation's truth. Further, even if the affidavit contains false statements made intentionally or

-17-

recklessly, a warrant based on the affidavit is still valid unless, 'with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause * * *.'" *State v. Taylor*, 174 Ohio App.3d 477, 482, 2007 Ohio 7066, 882 N.E.2d 945.

[**P21]  Here, if the statement is removed, the warrant still establishes probable cause to compel a DNA sample to confirm the match obtained from a search of the CODIS system. This warrant was not invalid.

[**P22]  The trial court ruled that the state had authority to collect and retain appellant's DNA profile under R.C. 109.573. The court also indicated that the sample obtained by Det. Chojnowski was taken in good faith. While the language used in R.C. 109.573, which allows for collection and storage of DNA profiles from "forensic casework," may be so broad as to encompass the facts before us, appellant lacks standing to challenge the search as violative of his Fourth Amendment right, and the exclusionary rule should not be applied to this case even if the DNA database search was beyond the scope of the statute.

*Emerson*, 192 Ohio App. 3d at 455-458 (footnotes omitted).

This decision was affirmed by the Supreme Court of Ohio, which set forth the following

analysis of Emerson's claims:

II. Analysis

A. Standing to Object

[**P14]  Appellant argues that he has a reasonable expectation of privacy in the DNA profile obtained from his sample. He contends that the state was able to use the DNA profile only for its lawfully obtained purpose—the rape investigation. Accordingly, appellant asserts that the continued retention of the DNA profile, and its subsequent use in the murder trial, was an impermissible search and seizure to which he has standing to object. In other words, the retention and subsequent use implicated the Fourth Amendment independently of the taking of the sample.

[**P15]  The Fourth Amendment to the United States Constitution and the Ohio Constitution, Article I, Section 14, prohibit unreasonable searches and seizures. We have interpreted Article I, Section 14 "to protect the same interests and in a manner consistent with the Fourth Amendment." *State v. Andrews*, 57 Ohio St.3d 86, 87, 565 N.E.2d 1271 (1991), fn. 1. The guarantee of the Fourth Amendment is protected by use of the exclusionary rule. *United States v. Calandra*, 414 U.S.

-18-

338, 347, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974).

[**P16] "'Fourth Amendment rights are personal rights which * * * may not be vicariously asserted.'" *Rakas v. Illinois*, 439 U.S. 128, 133-134, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), *quoting Alderman v. United States*, 394 U.S. 165, 174, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). "In order to have standing to challenge a search or seizure, the defendant must have a reasonable expectation of privacy in the evidence seized." *State v. Jackson*, 102 Ohio St.3d 380, 2004 Ohio 3206, 811 N.E.2d 68, ¶ 6, *citing Alderman* at 171-172. To determine whether a defendant has a reasonable expectation of privacy, it first must be determined whether "the individual manifested a subjective expectation of privacy in the object of the challenged search." *California v. Ciraolo*, 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986), *citing Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979). Then, a court must decide whether society is willing to recognize that expectation as reasonable. *Id*.

[**P17]  The defendant bears the burden of demonstrating that he possessed a legitimate expectation of privacy in the object of the search. *State v. Dennis*, 79 Ohio St.3d 421, 426, 1997 Ohio 372, 683 N.E.2d 1096 (1997), *citing Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980).

[**P18] A person has a legitimate expectation of privacy in his or her bodily fluids. *See Schmerber v. California*, 384 U.S. 757, 770, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). The expectation of privacy extends to the DNA in the sample obtained from appellant during the 2005 rape investigation. *See Smith v. State*, 744 N.E.2d 437, 439 (Ind. 2001). However, that sample was obtained pursuant to a search warrant. Appellant is not now challenging the warrant and does not present any evidence that he challenged the warrant when it was issued. Thus, there was no Fourth Amendment violation with respect to that sample, *see id.*, and the resulting DNA profile.

[**P19]  However, appellant argues that the DNA profile obtained from the sample taken during the 2005 rape investigation was used improperly. Specifically, appellant contends that the state was permitted to use the DNA profile only for the 2005 rape investigation and its retention and subsequent use subjected him to a new Fourth Amendment search and seizure. First, we must examine whether appellant manifested a subjective expectation of privacy in that DNA profile.

[**P20] A DNA sample and a DNA profile are not one and the same. Instead, a DNA sample is processed by a specialist to obtain the DNA profile. *See* R.C. 109.573(B)(5) and (H)(2). Once the sample is processed, a record is made of the profile. Accordingly, this scientific process results in a record separate and distinct

-19-

from the DNA sample. Because a scientific process must be performed on a DNA sample by an agent of the government to obtain the DNA profile, and the DNA profile is separate and distinct from the DNA sample, we conclude that the DNA profile obtained from appellant's DNA sample was the work product of the government. *See Smith*, 744 N.E.2d at 439. Therefore, appellant had no possessory or ownership interest in the DNA profile. *Id*.  Although, as discussed below, appellant may have been able to request expungement of that DNA profile from CODIS, BCI regulates access to and the use of the information until it is expunged. *See* R.C. 109.573.

[**P21]  Additionally, appellant presented no evidence at the suppression hearing that he sought expungement of the profile from CODIS upon his acquittal or that he took any other action in the intervening years to seek removal of the profile from CODIS. Therefore, appellant did not manifest a subjective expectation of privacy in the profile, at least to the extent that it remained in the possession of the state for criminal investigatory purposes.

[**P22]  Moreover, even if appellant had shown that he had manifested a subjective expectation of privacy in the DNA profile, society does not recognize that expectation as reasonable. "'[A] defendant [can] not plausibly assert any expectation of privacy with respect to the scientific analysis of a lawfully seized item of tangible property, such as a gun or a controlled substance. Although, human blood, with its unique genetic properties, may initially be quantitatively different from such evidence, once constitutional concerns have been satisfied, a blood sample is not unlike other tangible property which can be subject to a battery of scientific tests.'" (Emphasis omitted.) *Wilson v. State*, 132 Md.App. 510, 545, 752 A.2d 1250 (2000), quoting *People v. King*, 663 N.Y.S.2d 610, 614, 232 A.D.2d 111 (1997).

[**P23]  Further, retention by the state of a DNA profile for possible future comparison with profiles obtained from unknown samples taken from a victim or a crime scene does not differ from the retention by the state of fingerprints for use in subsequent investigations. As stated in *Bickley v. State*, 227 Ga.App. 413, 415, 489 S.E.2d 167 (1997), "[N]o matter how many times defendant's blood is tested, the DNA results would be identical. What defendant is really objecting to is the comparison of his DNA with DNA derived from samples taken from the  [*196] victims of crimes other than the one specified in the search warrant. * * * 'In this respect, DNA results are like fingerprints which are maintained on file by law enforcement authorities for use in further investigations.'" (Footnote omitted.)

[**P24]  We note that numerous courts around the country have examined this issue and have reached the same conclusion that we do here—a person has no reasonable expectation of privacy in his or her DNA profile extracted from a

lawfully obtained DNA sample. A defendant lacks standing to object to its use by the state in a subsequent criminal investigation. *See Herman v. State*, 122 Nev. 199, 207, 128 P.3d 469 (2006) (a DNA sample legally obtained in a criminal investigation that had no limitation on its use may be used in a subsequent investigation without implicating Fourth Amendment concerns because "[a] reasonable person would have understood that the resulting DNA profile, like fingerprints, could be available for general investigative purposes); *State v. Hauge*, 103 Haw. 38, 52, 79 P.3d 131 (2003) (once the authorities lawfully obtained a blood sample to test for DNA, using the test results in subsequent investigations is irrelevant to the question of whether a reasonable expectation of privacy existed); *Smith*, 744 N.E.2d at 439 ("once DNA is used to create a profile, the profile becomes the property of the Crime Lab. Thus, the defendant had no possessory or ownership interest in it"); *Washington v. State*, 653 So.2d 362, 364 (Fla. 1994), ("once [blood] samples were validly obtained, albeit in an unrelated case, the police were not restrained from using the samples as evidence in the murder case"); *State v. Barkley*, 144 N.C.App. 514, 521, 551 S.E.2d 131 (2001) ("a reasonable person would have understood by the exchange [between the defendant and the arresting officer] that his blood analysis could be used generally for investigative purposes, and not exclusively for the murder investigation"); *Wilson v. State*, 132 Md.App. 510, 546, 752 A.2d 1250 (2000), quoting *Bickley v. State*, 227 Ga.App. 413, 415, 489 S.E.2d 167 (1997) (defendant's objection to the comparison of his DNA, lawfully obtained in one investigation, with sample in another investigation was not well taken, because "'DNA results are like fingerprints which are maintained on file by law enforcement authorities for use in further investigations'"); *King*, 663 N.Y.S.2d at 614, 232 A.D.2d 111 ("once a person's blood sample has been obtained lawfully, he can no longer assert either privacy claims or unreasonable search and seizure arguments with respect to the use of that sample").

[**P25]  Although appellant concedes that the DNA sample was legally obtained, he argues that it is not a record made for public purposes. Appellant opines that [if] [it] were, any person would be able to access individual DNA samples obtained in a criminal investigation. Appellant contends that the privacy implications are demonstrated by the need to obtain a search warrant before obtaining a person's DNA.

[**P26]  Appellant's argument misses the mark. First, he focuses on the privacy implications associated with the 2005 DNA sample. As discussed above, there are privacy implications with respect to appellant's DNA. However, because a search warrant was executed to obtain the DNA sample, the Fourth Amendment was satisfied. Thus, the true focus of appellant's argument is on the DNA profile that the sample yielded. But, as discussed above, it is the profile for which there is not a reasonable expectation of privacy. Second, the General Assembly has provided a

-21-

level of confidentiality for the DNA profiles and samples. R.C. 109.573(E) states, "DNA records, DNA specimens, fingerprints, and photographs that the bureau of criminal identification and investigation receives pursuant to this section and sections 313.08, 2152.74, and 2901.07 of the Revised Code and personal identification information attached to a DNA record are not public records under section 149.43 of the Revised Code." *See also* R.C. 149.43(A)(1)(j) (DNA records stored in the DNA database pursuant to R.C. 109.573 are not public records).

[**P27]  Appellant was not subjected to a new Fourth Amendment search and seizure when the DNA profile was used during the second criminal investigation. The state did not violate any reasonable expectation of privacy held by appellant by using the DNA profile, which was the state's own record and which appellant took no action to have removed from CODIS after his acquittal. Because appellant does not have a reasonable expectation of privacy in the DNA profile, we conclude that appellant lacks standing to challenge its use by the state in a subsequent criminal investigation.

B. Retention of DNA Profile

[**P28]  Appellant also argues that the DNA profile should not have been retained by the state after he was acquitted of the rape charge. He contends that the state lacked the authority to retain the DNA profile and subsequently use it in the homicide investigation because he was acquitted of the 2005 rape charge. Appellant relies upon R.C. 109.573 and 2901.07 and section 17.6 of BCI's 2009 CODIS Methods Manual in support of his argument.

[**P29]  Appellant is correct that R.C. 2901.07 does not support the inclusion of his profile in CODIS. However, the same cannot be said for R.C. 109.573. The superintendent of BCI is empowered to "establish and maintain a DNA database." R.C. 109.573(B)(1)(b). "DNA database" is defined in part as "a collection of DNA records from forensic casework." R.C. 109.573(A)(3). "Forensic" is defined as "[u]sed in or suitable to courts of law or public debate." Black's Law Dictionary 721 (9th Ed.2009). In this case, the police lawfully obtained the DNA sample in the course of the 2005 rape investigation. Therefore, the profile obtained from the sample is a record from forensic casework and is properly maintained in CODIS. Moreover, we note that neither R.C. 109.573 nor 2901.07 require that the state, on its own initiative, remove the DNA profile of a person who was acquitted at trial.

[**P30]  There is no support in the CODIS Methods Manual for appellant's position. The manual has no provision for the removal of a DNA profile of an individual acquitted at trial. Section 17.6 sets forth the basis for expunging a DNA profile—a conviction being overturned on appeal or a sample taken in error—and the procedures that need to be followed. However, section 17.6 is not

-22-

self-executing. There is no mechanism set forth in the manual by which the state is automatically notified that a person's conviction has been overturned, requiring the profile of the acquitted person to be removed. Instead, the requirement of going forward is on the exonerated individual to notify CODIS that the conviction has been overturned and to seek expungement of the DNA profile. Appellant failed to do this.

[**P31]  There is no legislative requirement that DNA profiles obtained from lawfully obtained DNA samples be removed from CODIS on the state's initiative when the subject of the profile is acquitted at trial, and we will not create such a requirement. "Exclusion of extremely valuable evidence in crimes that often leave little other trace is a major social cost" and "the potential for abuse in the future is not sufficiently clear to warrant adopting a rule excluding evidence from the database on the ground that it was obtained or retained beyond the authorized classifications." *Smith*, 744 N.E.2d at 442.

[**P32]  Even if Ohio's statutory scheme required the removal of appellant's DNA profile upon his acquittal, suppression of that evidence is not appropriate. "[A] violation of a state statute, * * * in and of itself, [does not] give rise to a Fourth Amendment violation and result in the suppression of evidence." *State v. Jones*, 121 Ohio St.3d 103, 2009 Ohio 316, 902 N.E.2d 464, ¶ 15, citing *Virginia v. Moore*, 553 U.S. 164, 128 S.Ct. 1598, 170 L.Ed.2d 559 (2008). "[B]ecause of the need for consistency and bright-line standards when applying the Fourth Amendment, * * * 'it is not the province of the Fourth Amendment to enforce state law.'" *Id*. at ¶ 18, quoting *Moore* at 178. Since the General Assembly opted not to provide a remedy to a party wronged by a violation of either R.C. 109.573 or 2901.07, "we are not in the position to rectify this possible legislative oversight by elevating a violation of [these statutes] to a Fourth Amendment violation and imposing the exclusionary rule." *Id*. at ¶ 21, citing *Moore* at 178.

III. Conclusion

[**P33]  Accordingly, we conclude that a person has no reasonable expectation of privacy in his or her DNA profile extracted from a lawfully obtained DNA sample, and a defendant lacks standing to object to its use in a subsequent criminal investigation. Under these circumstances, the state is not prohibited from retaining in CODIS the DNA profile of a person acquitted of a crime and using the DNA profile in a subsequent criminal investigation. We accordingly affirm the judgment of the court of appeals.

*State v. Emerson*, 2012-Ohio-5047; 981 N.E.2d 787, 134 Ohio St. 3d 191, 193-199 (Ohio 2012),

*cert denied* 133 S. Ct. 1819 (2013).

-23-

The trial court held a suppression hearing, where evidence and testimony was presented. (ECF No. 9-12, Exh. 12.)  Thereafter, Emerson's argument was thoroughly addressed on not one but two rounds of appellate review.  Emerson's traverse acknowledges that he must demonstrate that his ability to present his Fourth Amendment claims was frustrated through a failure of Ohio's review process.  (ECF No. 17 at 11.)  He asserts that the appellate courts frustrated his right to an appeal when they "misapplied the Fourth and Fifth Amendments finding that he lacked standing to raise those claims....  The fact that he was able to file a notice of appeal does not relieve the appellate court of its duty to correctly interpret and apply Constitutional law." (ECF No. 17 at 11.)

The Court finds Emerson's argument bewildering.  Emerson cannot, in good faith, argue that he was denied his right to a meaningful appeal simply because he disagrees with the outcome.  The state courts did not merely allow him to file a notice of appeal.  Emerson filed briefs on the merits before both the state appellate court and the Ohio Supreme Court.  Moreover, as clear from the portions of the decisions quoted above, both the state appellate court and the Ohio Supreme Court addressed the substance of his Fourth Amendment claims ***on the merits***. Emerson's subjective belief that those courts misapplied state or federal law (or both) does not establish that he was denied his right to an appeal.  It further does not establish the state's mechanism for reviewing Fourth Amendment claims was frustrated by a failure of that mechanism.

Emerson's argument essentially seeks to circumvent the holding in *Stone* by boot-strapping the merits of his Fourth Amendment claim to the inquiry into whether a state's review mechanism for such claims has been frustrated.  Emerson misunderstands a habeas court's

-24-

function when reviewing a Fourth Amendment claim.  Clarifying the inquiry into whether a

defendant had a full and fair opportunity to present Fourth Amendment claims, the Sixth Circuit

recently held that "the *Powell* 'opportunity for full and fair consideration' means an available

avenue for the prisoner to present his claim to the state courts, not an inquiry into the adequacy of

the procedure actually used to resolve that particular claim." *Good v. Berghuis*, 729 F.3d 636,

639 (6th Cir. 2013).  Thus, "[i]n the absence of a sham proceeding, there is no need to ask

whether the state court conducted an evidentiary hearing or to inquire otherwise into the rigor of

the state judiciary's procedures for resolving the claim." *Id.*  Rather, "[w]e must presume that,

once a federal claim comes before a state court, the state judge will use a fair procedure to

achieve a just resolution of the claim." *Id.*  In sum, the Sixth Circuit explained that, when

considering whether a habeas petitioner had a full and fair opportunity to litigate his Fourth

Amendment claim,  "[o]ur approach, and the majority rule, asks a more basic and readily

administrable question: Did the state courts permit the defendant to raise the claim or not?" *Id.*

at 640.  *See also Harrington v. Warden, London Correctional Inst.*, 2013 WL 5944193 at * 4

(S.D. Ohio Nov. 5, 2013).

Here, it is undisputed that the trial court held a suppression hearing and that the issue was

fully addressed on two rounds of direct review.  This is more than adequate as the Sixth Circuit

has made clear that a state court "need do no more than 'take cognizance of the constitutional

claim and rule in light thereof.'"  *Riley*, 674 F.2d at 525 (quoting *Moore v. Cowan*, 560 F.2d

1298, 1302 (6th Cir. 1977)).  The state courts plainly satisfied this standard.   Though Emerson

believes that the state courts reached an incorrect result, such a position does not provide a

ground for habeas relief.  *See, e.g., Good*, 729 F.3d at 640 ("Applying our test to [petitioner's]

case is straightforward. [Petitioner] could, indeed did, present his suppression motion to the state trial court, and the trial court rejected it. He presented it again to the state appellate court, and the appellate court rejected it once more. That suffices to preclude review of the claim through a habeas corpus petition under *Stone v. Powell*."); *accord Putrus v. Smith*, 2013 U.S. Dist. LEXIS 164923 (E.D. Mich. Nov. 20, 2013) ("[T]he relevant inquiry is whether a habeas petitioner had an opportunity to litigate his claims, not whether he in fact did so or even whether the Fourth Amendment claim was correctly decided. Indeed, under *Stone*, the correctness of a state court's conclusions regarding a Fourth Amendment claim 'is simply irrelevant.'") (*citing Brown v. Berghuis*, 638 F. Supp. 2d 795, 812 (E.D. Mich. 2009)); *see also Cabrera v. Hinsley*, 324 F.3d 527, 531 (7th Cir. 2003) ("Absent a subversion of the hearing process, we will not examine whether the judge got the decision right."); *Marshall v. Hendricks*, 307 F.3d 36, 82 (3d Cir. 2002) ("An erroneous or summary resolution by a state court of a Fourth Amendment claim does not overcome the bar [set out in the *Stone* decision].")

In the instant matter, Emerson raised his Fourth Amendment claim before the trial court, an appellate court, and the Supreme Court of Ohio. Emerson points to no evidence tending to show that the suppression hearing or his appeals were tantamount to "sham proceedings." As there was no failure in the review process, his first, second, and third grounds for relief are not cognizable.

Finally, even if this Court were to address whether the substance of Emerson's argument, its inquiry would be restricted into ascertaining whether the state courts' decisions were contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. In *Maryland v. King*, 133 S. Ct. 1958 (2013), a defendant

was arrested and charged with assault for menacing a group of people with a shotgun and, as part of a routine booking procedure for serious offenses pursuant to the Maryland DNA Collection Act, the defendant's DNA sample was taken.  The DNA was found to match the DNA taken from a rape victim in an unrelated and unsolved crime.  *Id*.  The Supreme Court found that the processing of the defendant's DNA sample and its inclusion in CODIS "did not intrude on respondent's privacy in a way that would make his DNA identification unconstitutional."  133 Ct. at 1979.  As such, Emerson could not establish that clearly established federal law was unreasonably applied.

## B.  Ground Four: Ineffective Assistance of Trial Counsel

In his final ground for relief, Emerson asserts that he was deprived of the effective assistance of trial counsel.  (ECF No. 17 at 16-18.)

First, to establish ineffective assistance of counsel, a petitioner must demonstrate that his counsel's conduct was so below acceptable standards of representation that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment to the United States Constitution. *See Strickland v. Washington*, 466 U.S. 668 (1984); *United States v. Bavers*, 787 F.2d 1022 (6th Cir. 1985).  A petitioner also must demonstrate that a trial counsel's performance prejudiced the petitioner's defense to such an extent that it rendered the proceeding unfair.  *Id*.  To establish prejudice, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694.  In other words, a counsel's deficient performance must have "caused the defendant to lose what he otherwise would probably have won" and it must have been "so manifestly ineffective that defeat was snatched from the hands of probable victory."  *United States v. Morrow*, 977 F.2d 222, 229

(6th Cir. 1992).

"[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690.  Mere disagreements by a defendant with tactics or strategies employed by counsel are not enough to support a claim of ineffective assistance of counsel and there is a presumption that the challenged conduct of a petitioner's counsel was a matter of strategy.  *Id.* at 689; *see also United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990).

As explained by the United States Supreme Court:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult.  The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at ___, 129 S. Ct. 1411, 173 L. Ed. 2d 251.  The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ___, 129 S. Ct. 1411, 173 L. Ed. 2d 251.  Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland* 's deferential standard.

*Harrington v. Richter,* 131 S. Ct. 770, 788 (U.S. 2011); *accord Kennedy v. Warren*, 2011 WL 1642194, *2 (6th Cir. May 3, 2011); *accord Goza v. Welch*, 2012 U.S. Dist. LEXIS 178665 at **24-25 (N.D. Ohio Dec. 18, 2012).

Specifically, Emerson asserts that counsel was ineffective in two ways, though he only identifies one alleged deficiency: (1) trial counsel failed to request a *Franks* hearing challenging the sufficiency of the search warrant affidavit, which mischaracterized Emerson as a convicted felon.  *Id.*

-28-

The state appellate court addressed this argument as follows:

Ineffective Assistance of Counsel

[**P43]  Finally, appellant argues that he was "denied effective assistance of counsel." In order to substantiate a claim of ineffective assistance of counsel, the appellant is required to demonstrate that: 1) the performance of defense counsel was seriously flawed and deficient; and 2) the result of appellant's trial or legal proceeding would have been different had defense counsel provided proper representation. *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Brooks* (1986), 25 Ohio St.3d 144, 25 Ohio B. 190, 495 N.E.2d 407.

[**P44]  In reviewing a claim of ineffective assistance of counsel, it must be presumed that a properly licensed attorney executes his legal duty in an ethical and competent manner. *State v. Smith* (1985), 17 Ohio St.3d 98, 17 Ohio B. 219, 477 N.E.2d 1128; *Vaughn v. Maxwell* (1965), 2 Ohio St.2d 299, 209 N.E.2d 164.

[**P45]  The Ohio Supreme Court held in *State v. Bradley* (1989), 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373, that, "'[w]hen considering an allegation of ineffective assistance of counsel, a two-step process is usually employed. First, there must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties to his client. Next, and analytically separate from the question of whether the defendant's Sixth Amendment rights were violated, there must be a determination as to whether the defense was prejudiced by counsel's ineffectiveness.' *State v. Lytle* (1976), 48 Ohio St.2d 391, 396-397, 2 O.O.3d 495, 498, 358 N.E.2d 623, 627, vacated in part on other grounds (1978), 438 U.S. 910, 98 S.Ct. 3135, 57 L.Ed.2d 1154. This standard is essentially the same as the one enunciated by the United States Supreme Court in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 * * *."

[**P46]  "Even assuming that counsel's performance was ineffective, this is not sufficient to warrant reversal of a conviction. 'An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. *Cf. United States v. Morrison*, 449 U.S. 361, 364-365 [101 S.Ct. 665, 66 L.Ed.2d 564] (1981).' *Strickland*, *supra*, 466 U.S. at 691, 104 S.Ct. at 2066. To warrant reversal, '[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' *Strickland*, *supra*, at 694, 104 S.Ct. at 2068. In adopting this standard, it is important to note that the court specifically rejected lesser standards for

-29-

demonstrating prejudice." *Bradley* at 142.

[**P47]  "Accordingly, to show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Id*. at 143.

[**P48]  Here, appellant argues that trial counsel was deficient for failing to file a motion to investigate and invalidate the warrant used to compel appellant to submit a DNA sample based on the language in its attached affidavit that described the CODIS database as a "database that stores sample DNA from convicted felons in the State of Ohio." Appellant has not shown that a challenge of the inclusion of this statement in the warrant would have changed the outcome of the matter. Appellant argues that he was not a convicted felon, and the warrant would not have been issued without this mistaken reference. The challenged line does not state that appellant was a convicted felon or that his DNA profile was stored in the database as a result of being a convicted felon. The challenged averment merely inaccurately describes the CODIS database by leaving out all the other classes of profiles that are stored therein. Removing this sentence would likely have had no impact on the issuance of the warrant. Therefore, appellant has failed to demonstrate that a *Franks* hearing to challenge the validity of the warrant would have been successful, especially given the ruling of the trial court that the state had the authority to maintain appellant's DNA profile under R.C. 109.573.

*State v. Emerson*, 192 Ohio App. 3d at 463-465 (footnotes omitted).

The state appellate court analyzed Emerson's ineffective assistance of counsel claim under the *Strickland* test, and, therefore, applied the correct legal standard.  As such, the only issue is whether the court did so unreasonably.  The state appellate court found that, even assuming for the sake of argument that trial counsel was ineffective, Emerson could not demonstrate that exclusion of the challenged language in the warrant would have changed the outcome of the matter.  Earlier in its decision, the state appellate court made clear that even if the challenged language was removed, "the warrant still establishes probable cause to compel a DNA sample to confirm the match obtained from a search of the CODIS system.  This warrant is not invalid." *Emerson*, 192 Ohio App.3d at 458.  Under these circumstances, this Court cannot find that the

-30-

state appellate court's decision was an unreasonable application of clearly established federal law, as the prejudice prong under *Strickland* requires Emerson to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  Trial counsel cannot be found deficient for failing to challenge the sufficiency of the search warrant affidavit where exclusion of the offending language would likely have had no impact on the validity of the warrant.  Therefore, Emerson's fourth ground for relief should be denied

### V.  Conclusion

For the foregoing reasons, it is recommended that Emerson's Petition be DENIED.[4]

/s/ Greg White
U.S. MAGISTRATE JUDGE


Date: March 30, 2015



### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

-----------------------

[4]  The habeas petition requested that a hearing be held and that discovery be permitted. The Court finds neither a hearing nor discovery is necessary to decide the merits of the petition.